[Civil No. 2861. Filed April 29, 1930.]

[287 Pac. 300.]

N. P. SEVERIN and A. N. SEVERIN, Copartners, Doing Business Under the Name of N. P. SEVERIN COMPANY, Appellants, v. JOHN LATZ, Appellee.

Messrs. Curley & Pattee and Mr. A. R. Conner, for Appellants.

Messrs. Kingan & Darnell, for Appellee.

LOCKWOOD, C. J.—N. P. Severin and A. N. Severin, as copartners under the name of N. P. Severin Company, hereinafter called appellants, brought suit against John Latz, hereinafter called appellee, to recover damages in the sum of $36,000 for alleged breach of a certain contract. At about the same time Roy Place filed suit against Latz for breach of a contract, the result of which last suit was necessarily dependent on the construction of the contract involved in this action. The Place case, 287 Pac. 303, was tried to a jury, but the court at the conclusion of appellants' evidence instructed a verdict in favor of appellee, and it was agreed the present case should be submitted to the court on the same evidence and objections as the Place case, except as to damages, and, judgment being rendered for appellee herein, an appeal was taken in both cases, it being agreed that the judgment of this court in one would determine the other. Because logically the Place case depends on the present one, we have written this opinion in full, leaving the former named case for a memorandum opinion.

There are two assignments of error, in effect raising but one question, which is whether or not appellants' evidence was sufficient to entitle them to go to the jury on the issues set up in the pleadings. In considering a question of this nature, the evidence must, of course, be construed most favorably in behalf of appellants, and in the following statement of facts we so construe it:

For some years prior to entering into the contract in question, appellee had been the owner of certain realty in Tucson. He was considering erecting

thereon a first-class modern hotel building, and, not being able to finance the proposition himself, entered into a contract with appellants, which reads, so far as material to this case, as follows:

"Agreement made and entered into this 15 day of October, 1927, by and between John Latz of the County of Pima, State of Arizona, of the first part, and N. P. Severin Company of Cook county, Illinois, of the second part:

"Whereas, said first party is the owner of a certain tract of land situated on the northeast corner of the intersection of S. 6th Avenue and E. 12th Street, in the City of Tucson, Pima County, Arizona, and is desirous of erecting on said tract a certain hotel building. . . .

"Now, therefore, this agreement witnesseth: that first party extends to second party the privilege and right, within sixty days from this date, of trying to arrange for the financing of said building in a manner and on the terms satisfactory to said first party. In the event that second party is successful in arranging such finances and on terms acceptable to said first party, said first party agrees to have complete plans and specifications prepared for the erection of said hotel building and to contract with second party for the erection of said building.

"It is agreed that if a contract is entered into with second party for the construction of said building that second party's compensation shall be the sum of $39,000.00, which sum shall include all services rendered by second party in connection with the financing and erection of said building, and also include premium on the required bond. Provided, however, that should the cost of said building, including the contractor's and architect's fees, vary materially from the sum of $425,000.00, then in that event the fee to be received by second party shall be proportionately increased, or decreased."

Appellants' general plan for raising the money was to borrow as much as possible on a first mortgage on the property, and to advance the balance of the amount necessary themselves, taking a second mort-

gage as security. They made several attempts to interest parties in the first mortgage, but with no success, until during the month of November they succeeded in inducing James L. Marr, president of the Mortgage Investment Company of El Paso, to investigate the proposition. About the same time they wrote the following letter to appellee regarding the proposed second mortgage:

"In our former letter to you of this date we stated that we could accept the sum of $144,000.00 in second mortgage notes.

"As previously talked over with you, before actual construction work is commenced with you will enter into agreement with the holders of second mortgage notes, in case of your subsequent death or disability, that the management of the hotel will be turned over to the holders of the second mortgage notes to conduct the operation and management of said hotel until such time that all indebtedness of said hotel has been fully discharged to the first and second mortgage holders. That the terms of this agreement shall be such that the management by the holders of the second mortgage shall pay only such indebtedness as would constitute a lien against said hotel and site out of funds derived from operation of the hotel. The exact terms of this agreement to be drawn up by legal advisers selected by you and the holders of second mortgage notes.

"Further:—you agree to make application for and if possible, secure life insurance in policy made out in favor of the mortgage holders in the sum of $100,000.00, to apply on your indebtedness to the mortgage holders. The exact terms to be determined by legal advisers before construction work is commenced with.

"Yours very truly
"N. P. SEVERIN COMPANY
"[Signed]   A. N. SEVERIN."

November 22d Marr came to Tucson and got in touch with appellee and a representative of appellants. They had several meetings and discussions,

and, as a result, prepared a financial statement covering the estimated cost of the proposed hotel, the gross and net revenue, and the general method of financing it. After making up these figures, appellee, appellants' representative, Marr, and Roy Place, the architect who had prepared tentative plans for the building, went to the office of appellee's attorney for the purpose of explaining the matter to him so that he could prepare the legal papers necessary in the premises, and outlined the proposed transaction. We quote rather freely from the evidence of Marr on this point, as it is upon this testimony that appellants rely chiefly to establish their right to recover:

"Mr. Curley: Q. Now with reference to borrowing the money, the contract price of the building, and the other details, was there anything said about that, about whether he was satisfied or not? A. That first time we went there we outlined it in a general way to Judge Kingan. We went back later in the afternoon with Mr. Place, Mr. Bergendahl and Mr. Latz. At that time it was outlined in detail to Judge Kingan.

"Q. Now by outlined in detail, you mean by that what? A. We discussed the bond issue, the different expenses of it.

"Q. The cost of the building, what it was going to cost him? A. The cost of the building, Judge Kingan asked him several questions, which he answered.

"Q. And the question came up then as to whether or not he wanted to go through with the deal as outlined? A. Yes, sir.

"Q. What was said, if anything? A. Well, after the discussion Judge Kingan looked at him and said, 'Now, John, have you made up your mind that this deal is all right? You are going ahead with it, perfectly satisfied?' Mr. Latz said, 'Yes, I am satisfied. I am going ahead with it.' And Judge Kingan said, 'Well, I think it is a fine thing to have a nice hotel here like that in town.' And we sat there and discussed the matter a few minutes longer, and Mr. Latz had to go home, had to go back to the Hotel, he said, at that time, to relieve a clerk, or something of that kind.

"Q. Did you see him later then in the afternoon? A. Yes sir.

"Q. And where was that? A. About five o'clock, or a little after five, Mr. Place and Mr. Bergendahl and myself went up to the hotel, to Mr. Latz's hotel, the Congress, and met him there.

"Q. Did you have some conversation then about— A. I told Mr. Latz, I said, 'I am going to approve this loan, and before going back I want to discuss this thing thoroughly with you, all the details.'

"Mr. Darnell: Q. May I ask who was present there besides you? A. Mr. Bergendahl, Mr. Place, Mr. Latz.

"Mr. Curley: Q. And yourself? A. And myself. 'I want to discuss all these details further with you and have you understand it all thoroughly and realize that you are satisfied before I leave here.' We did that. I said, 'Now, you want to accept this proposition and go ahead with it?' He said, 'I certainly do.' I said, 'Well, under our arrangement, the company will no doubt approve any loan that I approve, but it is such a large loan I would like to submit it to our executive committee, and as I have your acceptance, if they approve it I will wire you that we have accepted the loan, or wire Mr. Place, rather, that we have accepted the loan, and so that we will have a record of it, you wire back your acceptance. We have to have a record.' And I said, 'Will you do that?' And he said, 'Yes, that will be perfectly satisfactory.' And at that time I mentioned to him the question of insurance, and I said, 'I would like to have that placed with one of our agents in El Paso if you have no objections.' And he said, 'Well, let's go in here and talk to this insurance man. He represents—I think—the Missouri State Life. He knows something about my condition.' And he said, 'He can tell you something favorable to it.' We went in to see him, and I think the man was out. I think we stayed in that man's office and talked for a few minutes."

After these two discussions, Marr returned to El Paso, and the next morning wired Place as follows:

"We will make Latz loan on basis discussed with him, Severin & Company and yourself. Will of course have to reduce all matters to writing as per agreement. Have Latz wire us at once his acceptance."

Place immediately notified appellee of the contents of this telegram, and the latter wired Marr as follows:

"Can not as yet accept your proposition as per wire to Roy Place. Will have to deal with bank first which is uncertain at the present."

—and to appellants' representative this message:

"Did not accept proposition of James Marr El Paso. Will have to wait for new lease and deal with bank first which will delay acceptance."

Nothing further was ever done by appellants to finance the deal, and the building was never erected.

It is the position of appellants that they were brokers in procuring a loan for appellee, and that their duty was fulfilled when they presented to the latter someone "able, ready and willing" to make the loan "in a manner and on the terms satisfactory" to appellee; and that it was not necessary that a binding contract for the loan be signed between appellee and the proposed lender. They further maintain that the evidence introduced by them was sufficient to go to the jury upon the question of whether or not they had fulfilled their contract.

The case presents two questions: First, a legal one for the court, as to the construction of the contract of October 15, which admittedly is the one on which appellants base their rights; and, second, when that meaning is determined, whether appellants had fulfilled their part thereof. The vital part of the contract reads as follows:

"That first party extends to second party the privilege and right, within sixty days from this date, of

trying to arrange for the financing of said building in a manner and on the terms satisfactory to said first party. In the event that second party is successful in arranging such finances and on terms acceptable to said first party, said first party agrees to have complete plans and specifications prepared for the erection of said hotel building and to contract with second party for the erection of said building."

It will be seen therefrom that, in order to recover, appellants must arrange for the financing of the building on terms satisfactory and acceptable to appellee. This involves two elements. The first was the presentation to appellee of a plan of financing so definite in its terms that nothing material remained for further discussion; for so long as anything remained unsettled, it was impossible for appellee himself to know, to say nothing of informing others, whether the proposition as complete would be acceptable. The second was an acceptance by appellee of such terms. The financing attempted in this case involved both a first and a second mortgage, and it was necessary the terms of both be satisfactory to appellee. The only offer made in regard to the latter contained in the record is found in the letter from appellants to appellee, above set out. This shows on its face that the complete terms of the second mortgage had not yet been agreed upon, and that many highly material matters, requiring the assistance of counsel, would need discussion and reduction to writing. The discussion in regard to the first mortgage had apparently gone farther in the settlement of terms, than did that for the second mortgage, but even it left many material details undetermined so far as the record shows. It therefore appears that neither of the parties who were to make the loans necessary for the financing of the building had made a definite detailed proposition to appellee such as he could accept or reject without further discussion, but had merely stated a general basis on which

they would finance the matter, provided the details were placed in writing and were mutually satisfactory. Even had appellee agreed to the propositions made in the telegram from Marr and the letter from appellants, it would not have been a final acceptance so as to bind him to pay a commission, but merely a statement that, so far as it had been outlined, the proposition was acceptable, and, if the remaining terms were equally satisfactory, he would close the deal. Suppose, for illustration, when the whole matter was reduced to writing, as appellants and Marr insisted it must be, there had been a disagreement as to the terms of maturity of either of the mortgages, or the parties had not been able to agree upon the terms of the provision in regard to turning the management of the hotel over to the holders of the second mortgage in case of appellee's death before his indebtedness was finally liquidated. He could unquestionably have refused to accept any terms on these matters which did not satisfy him, and, since appellants had made a written agreement on this last point, a condition precedent to their taking the second mortgage, their contract would not have been fulfilled until they had offered terms on that provision satisfactory to appellee.

Appellants contend that it is not necessary, in order that a broker be entitled to his commission, that the deal be actually consummated. This is undoubtedly true in many instances, but we think it will be found upon an examination of the cases, where the transaction was not completed and yet the broker was given judgment for a commission, that his principal had previously stated the specific terms he would require of the purchaser, and the broker had produced a purchaser who agreed to accept those terms. An analogous situation to that disclosed by this record would be one where the seller states to the broker that, if he can produce a purchaser who will

buy his property on terms satisfactory and acceptable to the seller, the latter will pay a commission. We think few, if any, cases can be found holding that under such a contract a broker may recover a commission before he has produced a purchaser who offers terms which are not only satisfactory to the seller so far as they go, but so essentially complete in character, either express or implied, that counsel skilled in the law could draw a contract thereon containing all the ingredients necessary to complete the deal.

Much space in the briefs is devoted to the question as to whether or not appellee could use his arbitrary discretion in accepting or rejecting the propositions of appellants or whether he was bound to act as a reasonable man in so determining. The courts have generally recognized there are two rules upon this question. Where the contract is one which involves personal taste, as the making of a suit of clothes, painting of a portrait, and other similar matters, the person to be satisfied may refuse to accept without showing any substantial reason for such refusal; but, where the duties of the parties with respect to performance are specifically set forth in the contract, the party determining it must show a substantial ground for dissatisfaction, to be determined by the trier of facts. *Yarno* v. *Hedlund Box & Lumber Co.*, 129 Wash. 457, 225 Pac. 659, 227 Pac. 518; *Adamson* v. *Alexander Milburn Co.*, (C. C. A.) 275 Fed. 148; *McCartney* v. *Badovinac*, 62 Colo. 76, L. R. A. 1917A 1146, 160 Pac. 190.

We think, however, under the facts of this case we need not consider which rule should apply, since we hold that appellants had failed to offer to appellee a proposition for financing the building so definite in its terms that an acceptance of what was offered would bind appellee to pay a commission if nothing further were done in the premises.

Under these circumstances, there was no issue of fact for the jury, and the court properly instructed a verdict for appellee.

Judgment affirmed.

McALISTER and ROSS, JJ., concur.